UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENSAMBLES HYSON, S.A. DE C.V.; RAIN BIRD CORPORATION; and RAIN BIRD INTERNATIONAL, INC.,<br><br>Petitioners,<br><br>v.<br><br>FRANCISCO JAVIER SANCHEZ,<br><br>Respondent. | Case No.: 23-CV-1887 JLS (KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART THE PETITION AND COMPLAINT**<br><br>(ECF No. 1) |

Presently before the Court are the Petition and Complaint ("Pet.," ECF No. 1) and supporting Declaration of Laurie Manahan ("Manahan Decl.," ECF No. 5) filed by Petitioners Ensambles Hyson, S.A. de C.V. ("Hyson"); Rain Bird Corporation ("RBC"); and Rain Bird International, Inc. ("RBI") (collectively, "Petitioners"). Respondent Francisco Javier Sanchez submitted an Opposition to the Petition ("Opp'n," ECF No. 13), and Petitioners filed a Reply ("Reply," ECF No. 14) thereto. The Court previously took this matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). *See* ECF No. 3 at 2. Having carefully considered the Parties' submissions, their arguments, and the law, the Court **GRANTS IN PART AND DENIES IN PART** the Petition.

/ / /

/ / /

# BACKGROUND

Petitioners are a set of interrelated companies. RBC is a global manufacturer and provider of irrigation products and services incorporated and headquartered in California. Manahan Decl. ¶ 2. The company has locations in multiple states and countries, including a facility in Mexico. *Id.* RBI, which is similarly located in California, is the wholly owned subsidiary of RBC. *Id.* ¶ 3. RBI, in turn, is the majority owner of Hyson, a company in Mexico that provides manufacturing and assembly services to RBC. *Id.* ¶ 4.

Respondent was hired by RBC as a "Materials Manager" in 2005. *Id.* Ex. 2 at 2.[1] With his offer letter, RBC sent Respondent a copy of the company's "Dispute Resolution Program," *id.* Ex. 3 at 2–13, and an "Agreement to Arbitrate Claims," *id.* at 14–17. The latter document, hereinafter referred to as the "Arbitration Agreement" or "Agreement," applied to "any dispute between the employee and the Company or any of its officers, directors, managers, employees or agents." *Id.* at 15. The Agreement also mandated that "[a]ny and all . . . claims . . . arising out of or relating to employee's employment or its termination at the Company" be "settled exclusively by final and binding arbitration pursuant to the Federal Arbitration Act" ("FAA"). *Id.* The Agreement further specified that the arbitration proceedings "shall be conducted in accordance with the then-current arbitration rules of the American Arbitration Association ("AAA") or the Judicial Arbitration and Mediation Services" ("JAMS"), depending on which rules the party initiating arbitration chose to apply. *Id.* Respondent signed the Agreement on November 6, 2005. *Id.* at 17.

Respondent continued working for Petitioners for sixteen years. *See* Decl. Francisco Javier Sanchez Supp. Opp'n ("Sanchez Decl.") ¶ 8, ECF No. 13-2. During that time, Respondent rose through the ranks, eventually landing the role of "Group Plant Manager." Manahan Decl. ¶ 6. Almost all of Respondent's job duties took place in Mexico, where he

---

[1] Pin citations to pages of the Parties' submissions, including their briefs, refer to the blue CM/ECF page numbers stamped along the top margin of each document.

managed a plant owned and operated by Hyson. Sanchez Decl. ¶ 4. Respondent also paid taxes—which he states were withheld from his wages by Petitioners—to the Mexican government. *Id.* ¶ 9. Respondent did, however, attend work meetings in the United States on a regular, albeit infrequent, basis. *Id.* ¶ 8; Pet. ¶ 15. Moreover, Respondent lived in Chula Vista, California while working for Petitioners. Manahan Decl. ¶ 8.

On April 8, 2021, while on the job at Hyson's plant in Mexico, Respondent was fired. *Id.* ¶ 6; Sanchez Decl. ¶ 10. Twelve days later, Respondent initiated a wrongful termination action against all three Petitioners by filing a complaint with the Local Conciliation and Arbitration Board[2] (the "Labor Board") in Tijuana, Mexico. Decl. Blanca Irene Villaseñor Pimienta Supp. Resp't's Opp'n ("Villaseñor Decl.") ¶ 7, ECF No. 13-1. After these proceedings (the "Mexico Proceedings") commenced, Hyson was served with process on May 19, 2021, while RBC and RBI were served on February 16, 2023. *Id.*

On March 24, 2023, Hyson filed a motion challenging the Labor Board's jurisdiction over Respondent's suit. *Id.* Ex. 9 at 77. Hyson argued that the case involved an employment relationship between Respondent and "foreign entities" RBC and RBI, so the laws of Mexico could not apply to Respondent's claim. *Id.* at 78. The Labor Board deemed Hyson's motion "unfounded" on April 3, 2023. *Id.* at 79. The Labor Board explained that the issue of whether Mexican law applied to a foreign company was a "substantive matter" that could only be ruled on after an award was granted. *See id.* at 84. Beyond the jurisdictional motion, it appears that Respondent and Hyson have "submitted evidence and expect the Labor Board to soon schedule hearing dates for depositions and witness examinations." Pet. ¶ 30. Per Petitioners, however, RBC and RBI have not appeared in the Mexico Proceedings. *Id.* ¶ 30.

The instant Petition followed on October 16, 2023.

///

---

[2] Though the name may suggest otherwise, local conciliation and arbitration boards are not private arbitration tribunals. Rather, they are government agencies in Mexico with "exclusive and binding jurisdiction to hear all disputes involving employees and their employers." Villaseñor Decl. ¶ 5.

## LEGAL STANDARD

The FAA governs the enforceability of arbitration agreements in contracts.[3] *See* 9 U.S.C. § 1, *et seq.*; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24–26 (1991). "A party aggrieved by the alleged failure" or "refusal of another to arbitrate" pursuant to a written arbitration agreement may petition a federal court to compel arbitration in accordance with said agreement. 9 U.S.C. § 4. The FAA reflects both a "liberal federal policy favoring arbitration agreements" and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (first quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); and then quoting *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

In deciding whether to compel arbitration, courts must generally "determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). The first issue is non-delegable and must be decided in district court. *Ahlstrom*

---

[3] Petitioners initiated this action pursuant to Chapter 3 of the FAA. *See* Pet. ¶ 5 (invoking 9 U.S.C. §§ 301, *et. seq.*); Civil Cover Sheet at vi, ECF No. 1-1. Chapter 3 implements the Inter-American Convention on International Commercial Activity (the "Convention"), also known as the Panama Convention, which provides a regional framework for ensuring that courts recognize and enforce arbitration agreements and awards relating to international commercial transactions. *See* 9 U.S.C. §§ 301, 304. The Parties, however, do not explain why the Convention—rather than Chapter 1's rules for domestic arbitration—applies here. Indeed, the Parties do not appear to apply the Convention's provisions at all; their briefs almost exclusively address the application of the FAA's first chapter, and the cases they cite do the same.

The Parties lack of specificity around the rules governing this case is not overly problematic, though, as the Convention largely incorporates the rules found in Chapter 1. *See id.* § 307; *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1077–78 (S.D. Cal. 2013) ("Section 307 requires the residual application of Chapter 1 of the FAA, the law governing domestic arbitration, so long as it does not conflict with Chapter 3 or with the Panama Convention."). And "because of the residual application of chapter 1 procedures found principally in § 4," proceedings brought under the various chapters of the FAA "do not necessarily look markedly different." *Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 989 (7th Cir. 2014). Accordingly, the Court will proceed as the Parties have and assume the rules provided by Chapter 1 of the FAA apply in this action. *See Freaner*, 966 F. Supp. 2d at 1078 ("Section 2 of the FAA, which establishes the substantive validity of domestic arbitration agreements, also applies to arbitration agreements falling under the Panama Convention.").

*v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021). The second issue involves "question[s] of arbitrability," which ask "whether the parties have submitted a particular dispute to arbitration." *Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016) (quoting *Howsam*, 537 U.S. at 83). Those questions, which also implicate "issues of validity," *Ahlstrom*, 21 F.4th at 634, are presumptively reserved for the courts absent clear and unmistakable evidence that the parties decided otherwise, *Martin*, 829 F.3d at 1123.

Courts generally resolve the above gateway issues by "apply[ing] ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also* 9 U.S.C. § 2. If the answer to both questions is yes, a court must enforce the agreement and compel arbitration. *See, e.g.*, *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). Doubts regarding the scope of an agreement must be resolved in favor of arbitration. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995).

That said, the "right to arbitration, like other contractual rights, can be waived." *Martin*, 829 F.3d at 1124. In the Ninth Circuit, "the test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023).

## ANALYSIS

The Parties do not dispute that an arbitration agreement exists between RBC and Respondent. Instead, the Parties contest whether they agreed to delegate arbitrability issues to the arbitrator, whether the Arbitration Agreement is valid and under what law, whether Petitioners have waived their right to arbitration, whether Hyson and RBI can enforce the Agreement as nonsignatories, and whether Petitioners have established a right to an anti-suit injunction. The Court addresses each issue in turn.

**I. Delegation of Arbitrability**

The Parties appear to agree that federal arbitrability law controls the delegation inquiry in this case. *See* Opp'n at 11–12 (citing federal arbitrability case law in section on

delegation); Reply at 3–4 (same). This is not surprising, as "federal law governs the arbitrability question by default" when an arbitration agreement is "covered by the FAA." *Brennan*, 796 F.3d at 1129. And here, the Agreement indicates that relevant disputes "shall be settled exclusively by final and binding arbitration pursuant to the [FAA]." Manahan Decl. Ex. 3 at 15.

Under federal law, gateway questions of arbitrability can be "delegated to the arbitrator where 'the parties *clearly and unmistakably*'" so agree. *Brennan*, 796 F.3d at 1130 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Clear and unmistakable evidence of an intended delegation "might include . . . a course of conduct demonstrating assent" or "an express agreement." *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (alteration in original) (quoting *Rent-A-Ctr.*, 561 U.S. at 79–80 (Stevens, J., dissenting)).

Petitioners argue the Parties delegated arbitrability issues to the arbitrator by incorporating the AAA's arbitration rules ("AAA Rules") into the Agreement. *See* Rely at 3. Petitioners rely on *Brennan*, which held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." 796 F.3d at 1130. Petitioners point out that here, the Agreement adopts the "employment arbitration rules of the [AAA] or [JAMS] . . . in effect at the time of arbitration." Manahan Decl. Ex. 3 at 15. And, as Petitioners note, AAA Rule 6(a) provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Am. Arb. Ass'n, *Employment Arbitration Rules and Mediation Procedures* 12 (2023), https://www.adr.org/sites/default/files/EmploymentRules-Web.pdf.[4]

---

[4] Neither side provided the Court with a copy of the AAA Rules. Fortunately, though, the Court may take judicial notice pursuant to Federal Rule of Evidence 201(b) of facts "that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," including rules taken from the AAA's website. *Jackson v. Tic–The Indus. Co.*, No. 1:13-CV-02088-AWI, 2014 WL 1232215, at *8 n.2 (E.D. Cal. Mar. 24, 2014) (citing *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.1993)).

Respondent's counterargument is limited in scope. Respondent concedes that the Agreement "invokes" the AAA Rules and JAMS Rules, and that both sets of rules "have arbitrability delegation clauses." Opp'n at 13. Respondent argues, though, that *Brennan* does not apply in this case. Respondent notes that the Ninth Circuit expressly limited the reach of its holding to arbitration agreements "between sophisticated parties." *Brennan*, 796 F.3d at 1131 (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 n.2 (9th Cir. 2013)). So, per Respondent, "[w]hen one of the parties is not sophisticated, the invocation of the AAA Rules" does not satisfy the clear-and-unmistakable-evidence standard. Opp'n at 13. And as he is not a sophisticated party, Respondent claims, the Court must decide issues of arbitrability.

Acknowledging *Brennan*'s limited holding, Petitioners make two additional arguments. First, Petitioners contend that, since *Brennan*, lower courts have applied the Ninth Circuit's reasoning and conclusion to cases involving unsophisticated Parties. *See* Reply at 3–4. Petitioners further claim Respondent was sufficiently sophisticated, so *Brennan* applies regardless.

On this issue, Petitioners have the stronger argument. District courts have split over *Brennan*'s application to cases involving unsophisticated parties, *see, e.g.*, *Greenberg v. Amazon.com, Inc.*, No. 20-CV-02782-JSW, 2021 WL 7448530, at *6 (N.D. Cal. May 7, 2021) (describing the split in authority), and reports of an established majority approach may be greatly exaggerated.[5] The Court, however, is persuaded by the cases

---

[5] *Compare, e.g.*, *Maybaum v. Target Corp.*, No. 222CV00687MCSJEM, 2022 WL 1321246, at *5 (C.D. Cal. May 3, 2022) ("[T]he majority of courts have concluded that *Brennan* applies equally to sophisticated and unsophisticated parties."), *and Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 992 (N.D. Cal. 2017) (stating "the clear weight of authority supports the conclusion" that incorporation of AAA rules "provide[s] clear and unmistakable evidence of the parties' intent to delegate . . . arbitrability" regardless of the sophistication of the parties), *with Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) ("[T]he majority of the lower courts in the Ninth Circuit have 'held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party.'" (quoting *Ingalls v. Spotify USA, Inc.*, No. C 16-03533 WHA, 2016 WL 6679561, at *4 (N.D. Cal. Nov. 14, 2016))), *and Magill v. Wells Fargo Bank, N.A.*, No. 4:21-CV-01877 YGR, 2021 WL 6199649, at *5 (N.D. Cal. June 25, 2021) ("Where at least one party is

applying *Brennan* regardless of a party's sophistication. The Ninth Circuit in *Brennan* went out of its way to avoid "foreclos[ing] the possibility that [*Brennan*'s] rule could also apply to unsophisticated parties." 796 F.3d at 1130–31. *Brennan* also noted that "the vast majority of the circuits" in agreement with its holding did not "explicitly limit[]" their "holding[s] to sophisticated parties." Further, the clear-and-unmistakable inquiry focuses on "the parties' *manifestation of intent*," *Rent-A-Ctr.*, 561 U.S. at 69 n.1, which is best surmised from plain contractual language—not from the parties' sophistication. Indeed, an inquiry into a party's sophistication may be better suited to a court's unconscionability analysis, where courts *do* consider relative levels of sophistication. *See Esquer v. Educ. Mgmt. Corp.*, 292 F. Supp. 3d 1005, 1012 n.2 (S.D. Cal. 2017).

Even if the Court concluded otherwise, Respondent's argument would still fail. Courts evaluating whether to apply *Brennan* have generally asked whether a party had "a modicum" of sophistication. *See, e.g.*, *Galen v. Redfin Corp.*, No. 14-CV-05229-TEH, 2015 WL 7734137, at *7 (N.D. Cal. Dec. 1, 2015). *But see Money Mailer, LLC v. Brewer*, No. C15-1215RSL, 2016 WL 11479219, at *2 (W.D. Wash. Nov. 15, 2016) (noting some courts requiring "a higher level of sophistication"). Respondent was a "plant manager," Sanchez Decl. ¶ 5, a position requiring at least ten years of experience and a degree, *id.* at 32. Respondent was well-qualified for his role—which paid nearly $300,000 by the time he left RBC's employ, Manahan Decl. Ex. 6 at 12—as he possessed both a master's in business administration and the requisite years of experience before he applied for the job, *see generally id.* Ex. 1. Courts have found that such business and industry-specific experience and education constitutes at least a modicum of sophistication.[6]

---

unsophisticated, judges in this district routinely find that the incorporation of the AAA rules is insufficient to establish a[n] . . . agreement to arbitrate arbitrability.").

[6] *See Capelli Enters., Inc. v. Fantastic Sams Salons Corp.*, No. 5:16-CV-03401-EJD, 2017 WL 130284, at *4 (N.D. Cal. Jan. 13, 2017) (finding parties sufficiently sophisticated "in the details of business transactions" due to advanced degrees and prior contractual experiences); *Caviani v. Mentor Graphics Corp.*, No. 19-CV-01645-EMC, 2019 WL 4470820, at *5 (N.D. Cal. Sept. 18, 2019) (holding party sophisticated where he was "a well-versed businessman, an MBA-program attendee, fluent in English,"

In light of the above, the Court holds that the Agreement clearly and unmistakably delegates gateway arbitrability questions of validity and scope to the arbitrator.

## II.     Enforceability of the Arbitration Agreement

As the Parties delegated arbitrability matters, questions regarding the enforceability and validity of the Agreement *as a whole* fall to the arbitrator, not the Court. *See Rent-A-Ctr.*, 561 U.S. at 70–71; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S Ct. 524, 528 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision . . . ."). Still, the Court must decide "whether the particular agreement to *delegate* arbitrability—the Delegation Provision—is itself" unenforceable if Respondent poses that question. *Brennan*, 796 F.3d at 1132; *see also Saperstein v. Thomas P. Gohagan & Co.*, 476 F. Supp. 3d 965, 975 (N.D. Cal. 2020) ("[I]f a party challenges specifically the enforceability of the delegation clause, the district court must consider the challenge, but if a party challenges the enforceability of the arbitration agreement as a whole, the challenge is for the arbitrator.").

To challenge the delegation's validity, Respondent must both mention the delegation provision *and* make arguments specific to it. *See Rent-A-Ctr.*, 561 U.S. at 72–74.[7] The bare assertion that a delegation clause is unenforceable does not suffice. *See Zeevi v. Citibank, N.A.*, No. 219CV02206GMNBNW, 2021 WL 621423, at *3 (D. Nev. Feb. 16, 2021) (finding challenge was only to entire agreement where plaintiff "d[id] not specifically challenge the delegation clause beyond the unsubstantiated claim that it [was] unconscionable").

/ / /

---

"had a 15-year history of business dealings," and received $82,200 to $195,000 in compensation); *Galen*, 2015 WL 7734137, at *7 (concluding real estate agents were sophisticated as they were "required to obtain a license in order to practice their profession").

[7] After briefing on the Petition was complete, the Ninth Circuit confirmed this reading of *Rent-A-Center*. *See Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023) ("[A] party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration.").

In this instance, the arguments in Respondent's Opposition are exclusively aimed at the enforceability of the Arbitration Agreement as a whole. *See, e.g.*, Opp'n at 11 (beginning argument under the following heading: "The Court Should Deny the [Petition] Because the Arbitration Agreement is Unenforceable" (emphasis omitted and capitalization altered)). The structure of Respondent's argument further confirms the point; he first argues *Brennan* does not apply and then claims the Agreement is invalid and unenforceable under Mexican law. *See generally id.* at 11–21.

As Respondent has not attacked the enforceability of the delegation provision—which was incorporated by reference into the Agreement and unambiguously delegates arbitrability issues to the arbitrator—the Court cannot entertain his challenge. *See Rent-A-Ctr.*, 561 U.S. at 72–74; *Brennan*, 796 F.3d at 1133–34. To clarify, the Court does not now decide whether Mexican law applies to questions of validity and enforceability or whether Respondent's grievances are arbitrable. In this Order, the Court holds only that those questions must be answered by an arbitrator in the first instance.

**III. Waiver of the Right to Arbitration**

Respondent next argues that (1) the Court should decide the waiver question regardless of whether the Parties delegated arbitrability issues; and (2) the Petition must be denied because Petitioners waived their right to demand arbitration. *See* Opp'n at 21–22. The Court accepts the first point—which Petitioners do not contest—but rejects the second.

*A.   The Delegation of the Waiver Issue*

Waiver of the right to arbitration falls into the category of gateway questions that are presumptively for courts to decide but can be delegated. *See Martin*, 829 F.3d at 1122–23. But a valid delegation of *some* arbitrability issues does not necessarily delegate *all* such issues. Instead, the Ninth Circuit has asked whether an agreement clearly, unmistakably, and *specifically* delegates waiver. *See id.* (holding language delegating "[a]ll determinations as to the scope, enforceability, and effect" of an arbitration agreement to the arbitrator "insufficient to show an intent that an arbitrator decide the waiver . . . issue" (first alteration in original); *Slaten v. Experian Info. Sols., Inc.*, No. CV 21-09045-MWF

(EX), 2023 WL 6890757, at *3 (C.D. Cal. Sept. 6, 2023) (rejecting argument that an agreement delegated waiver issue where it was "broad" and "d[id] not mention waiver").

As Petitioners fail to identify any provision in the Agreement, AAA Rules, or JAMS Rules that delegates waiver questions, the Court will proceed to address the merits of Respondent's contention. *See Schwendeman v. Health Carousel, LLC*, No. 18-CV-07641-BLF, 2019 WL 6173163, at *4 (N.D. Cal. Nov. 20, 2019).

### B.     The Merits

In the Ninth Circuit, "the test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill*, 59 F.4th at 468. "[T]he party opposing arbitration . . . bears the burden of showing waiver," but that burden is not especially "heavy." *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1014 (9th Cir. 2023). That is to say, "the burden for establishing waiver of an arbitration agreement is the same as the burden for establishing waiver in any other contractual context." *Id.* at 1015; *see also Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022) ("[T]he text of the FAA makes clear that courts are not to create arbitration-specific procedural rules . . . .").

The Parties do not appear to dispute that the first element—Petitioners' knowledge of an existing right to compel arbitration—is satisfied. Indeed, Petitioners fail to mention that element at all. *See* Reply at 7 ("A party waives its right . . . when it takes actions inconsistent with the right to arbitrate."). Consequently, the Court's decision hangs solely on Respondent's ability to establish waiver's second factor. *See Anderson v. Starbucks Corp.*, No. 20-CV-01178-JD, 2022 WL 797014, at *3 (N.D. Cal. Mar. 16, 2022) (skipping first element where defendant "d[id] not suggest that it was unaware of its own arbitration agreements with the named plaintiffs").

There is no "concrete test" for evaluating the second element of waiver; rather, courts must "consider the totality of the parties' actions." *Hill*, 59 F.4th at 471 (quoting *Newirth ex rel. Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 941 (9th Cir. 2019)). The essential question is whether "those actions holistically 'indicate a conscious

decision . . . to seek judicial judgment on the merits of the arbitrable claims, which would be inconsistent with the right to arbitrate.'" *Armstrong*, 59 F.4th at 1015 (alteration in original) (quoting *Hill*, 59 F.4th at 473 n.19). The answer to that question is generally yes if a party "(1) ma[de] an intentional decision not to move to compel arbitration and (2) actively litigate[d] the merits of a case for a prolonged period of time in order to take advantage of being in court." *Id.* (quoting *Newirth*, 931 F.3d at 941).

Respondent first argues that Petitioners waived their right to arbitration by failing to assert it for an extended period of time. Specifically, he claims Hyson was served in the Mexico Proceedings over two and a half years—and RBI and RBC were served approximately ten months—before the instant Petition was filed. Opp'n at 23. That alleged delay is arguably sufficient to show an intentional decision was made not to move to compel arbitration. *See Martin*, 829 F.3d at 1125 ("[A] party's extended silence and delay in moving for arbitration may indicate a 'conscious decision to continue to seek judicial judgment on the merits . . . .'" (quoting *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988))); *Hill*, 59 F.4th at 472 (explaining a "party's inconsistent behavior with respect to its arbitration right" can be revealed by a lengthy delay in demanding arbitration); *Slaten*, 2023 WL 6890757, at *4 (finding eighteen-month delay in demanding arbitration sufficient to indicate an intent inconsistent with a right to arbitrate).

But delay, standing alone, is generally not sufficient to establish waiver. *See, e.g.*, *Sywula v. Teleport Mobility, Inc.*, No. 21-CV-01450-BAS-SBC, 2023 WL 4630620, at *7 (S.D. Cal. July 18, 2023) ("[T]he length of delay is just one factor that gives color to the totality of Defendants' conduct . . . ."). In other words, something more than delay is typically needed to show a party has actively litigated the merits of the case. *Compare Martin*, 829 F.3d at 1126 (concluding party waived arbitration where they delayed seventeen months *and* "devot[ed] 'considerable time and effort' to a joint stipulation," "fil[ed] a motion to dismiss on a key merits issue, enter[ed] into a protective order, answer[ed] discovery, and prepar[ed] for and conduct[ed] a deposition" (footnote

omitted)), *Hill*, 59 F.4th at 473 (finding waiver where defendant "exerted a significant amount of energy challenging the merits of the legal theory underlying" plaintiff's claims), *and FBC Mortg., LLC v. Skarg*, No. 23-CV-00143-CRB, 2023 WL 6933359, at *3 (N.D. Cal. Oct. 19, 2023) (holding parties waived where they "waited eight months *and* affirmatively 'engaged in other litigation procedure'"), *with Armstrong*, 59 F.4th at 1015–16 (rejecting waiver argument where defendant "never s[ought] or obtain[ed] a ruling on the merits" and made only "limited discovery requests"), *and United Specialty Ins. Co. v. Clean & Sober Media LLC*, No. 2:20-CV-02765-RGK-KS, 2021 WL 3623300, at *4–5 (C.D. Cal. Apr. 16, 2021) (deciding party had not waived as "the Ninth Circuit has found waiver" when a "motion to dismiss was coupled with prolonged delays . . . *and* significant additional litigation activity" (emphasis added)).

Respondent's attempt to offer "something more" beyond delay does not succeed. Respondent points out that Hyson filed a motion disputing the court's jurisdiction in the Mexico Proceedings. Opp'n at 21. Respondent further notes that Petitioners filed the instant Petition only after Hyson's jurisdictional motion was rejected. *See id.* Under binding Ninth Circuit precedent, however, "filing a motion to dismiss that does not address the merits of the case is not sufficient to constitute an inconsistent act." *Martin*, 829 F.3d at 1125. So, "moving to dismiss an action on jurisdictional . . . grounds" does little to bolster Respondent's position. *Newirth*, 931 F.3d at 942 n.10; *see also Sywula*, 2023 WL 4630620, at *8 (concluding defendants that filed three motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) had not waived their right to arbitration).

Respondent also claims Petitioners "participated in a settlement conference and have presented evidence in the Mexic[o] [P]roceedings." Opp'n at 22. Respondent supports this contention by claiming that the "[s]ettlement (conciliation meeting) was set for March 29, 2023," and that "Hyson made an appearance." Villaseñor Decl. ¶ 7. But it appears that the March 29 meeting was where Hyson filed its jurisdictional motion, not where Hyson sought to settle the case. *See id.* Ex. 9 at 77. And the only evidence Hyson

offered at said meeting was meant to back its motion. *See id.* at 80. Respondent does not explain how presenting evidence to support a non-merits-based motion is inconsistent with an existing right to arbitration, nor does he cite any case law to that effect.

The most compelling piece of evidence in Respondent's favor is Hyson's near three-year delay in demanding arbitration. That delay gives the Court pause, as it is far longer than those found problematic in other cases. *See, e.g.*, *Martin*, 829 F.3d at 1126 (finding waiver after seventeen-month delay); *Newirth*, 931 F.3d at 943 (rejecting argument that "one-year delay . . . was not inconsistent with [defendant's] arbitration right"). But Respondent cites no case in which delay alone constitutes waiver, nor is this Court aware of any. Respondent also fails to acknowledge that far less time—ten months—elapsed between when RBC and RBI were served in the Mexico Proceedings. Relatedly, Respondent has neither asked the Court to find that Hyson—but not its fellow Petitioners—waived the right to arbitration, nor explained what the practical consequences of such a ruling might be. *See* Opp'n at 24 (arguing only that "*Petitioners* have waived" (emphasis added)).

In short, Respondent has not met his burden. The Court thus rejects his argument and declines to deny the Petition on waiver grounds.

**IV.    Enforcement by Non-Signatories**

The Parties also dispute whether RBI and Hyson can, as nonsignatories, enforce the Arbitration Agreement. Litigants not party to an arbitration agreement can nevertheless "invoke arbitration under the FAA if the relevant state contract law allows [them] to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013). Following the Parties' lead, the Court thus turns to the "limited exceptions" California allows to the general rule that "only parties to an arbitration contract may enforce it or be required to arbitrate." *Nguyen v. Tran*, 68 Cal. Rptr. 3d 906, 909 (Ct. App. 2007). Hyson and RBI, as nonsignatories seeking arbitration, bear the burden of proving they can enforce the arbitration agreement. *See Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 832 (9th Cir. 2022).

Relevant here is California's agency exception, under which a nonsignatory may invoke arbitration "if a preexisting . . . agency relationship between the nonsignatory and one of the parties to the arbitration agreement[] makes it equitable to impose the duty to arbitrate upon the nonsignatory." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013) (quoting *Westra v. Marcus & Millichap Real Estate Inv. Brokerage Co.*, 28 Cal. Rptr. 3d 752, 756 (Ct. App. 2005)). At bottom, California's agency exception asks two questions: (1) whether an agency relationship existed; and (2) whether the existence of that relationship "makes it equitable" for the nonsignatory to enforce the arbitration agreement. *See, e.g.*, *Cohen v. TNP 2008 Participating Notes Program, LLC*, 243 Cal. Rptr. 3d 340, 358–359 (Ct. App. 2019).

Starting with the first issue, California defines an agency relationship as one in which "[a]n agent . . . represents . . . the principal" in "dealings with third persons." Cal. Civ. Code § 2295. The existence of such a relationship can be observed directly from express contractual language or inferred from the circumstances and conduct of the parties. *See, e.g.*, *Gerton v. Fortiss, LLC*, No. 15-CV-04805-TEH, 2016 WL 613011, at *8 (N.D. Cal. Feb. 16, 2016). One hallmark of agency relationships is a principal's ability to "maintain control over the[ir] agent's actions." *Murphy*, 724 F.3d at 1232. Here, as RBI—itself the majority owner of Hyson—is the wholly owned subsidiary of RBC, Manahan Decl. ¶¶ 3–4, RBC maintains the requisite control over its fellow Petitioners. *See Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 990 (N.D. Cal. 1996) ("Agency principles have been held to permit nonsignatory corporations to compel arbitration under arbitration clauses signed by their corporate parents, subsidiaries, or affiliates . . . .").

The agency relationship is not enough in and of itself. To establish the right to compel arbitration, a nonsignatory must also demonstrate a connection between (1) the plaintiff's claims against the nonsignatory; (2) the alleged agency relationship between a party to the agreement and the nonsignatory; and (3) the underlying agreement itself. *See Ford Motor Warranty Cases*, 306 Cal. Rptr. 3d 611, 624–25 (Ct. App. 2023). Those connections exist here. In Mexico, Respondent initiated a single wrongful termination

action against all three Petitioners. Manahan Decl. Ex. 6 ("Resp't's Compl.") at 9. Respondent's Complaint ties its claim directly to Petitioners' agency relationship by arguing Petitioners are "related companies" that can all be held liable. *See id.* at 11. And the Agreement, by its own terms, applies to "any dispute between the employee and [RBC] or any of its . . . agents" relating to the "employee's employment or its termination." Manahan Decl. Ex. 3 at 15. All three elements are therefore closely connected.

This conclusion is reinforced by an alternative articulation of the agency exception. "[W]hen a *plaintiff* alleges a defendant acted as an agent of a party to an arbitration agreement, the *defendant* may enforce the agreement even though the defendant is not a party thereto." *Thomas v. Westlake*, 139 Cal. Rptr. 3d 114, 120 (Ct. App. 2012) (emphasis added). "[G]eneralized allegations of an agency relationship made in a complaint are not" sufficient to invoke this rule. *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1215 (9th Cir. 2016). But a more detailed complaint that, for example, levies labor violations against defending companies "as joint employers, refer[s] to [the] employers as 'defendants' without any distinction, and allege[s] identical claims and conduct regarding unlawful and improper acts" can support the agency exception. *Garcia v. Pexco, LLC*, 217 Cal. Rptr. 3d 793, 797 (Ct. App. 2017). The operative question is whether the "complaint allege[s] the . . . defendants were joint employers fulfilling the same role." *Id.*

In this case, Respondent's Complaint alleges he was hired by "the defendants" to provide services to all three Petitioners. Manahan Decl. Ex. 6 at 11. Respondent's Complaint also accuses "the defendants" of wrongful termination and seeks the "execution of [Respondent's] individual employment contract" that, Respondent implicitly alleges, binds each Petitioner. *Id.* at 9. Respondent's Complaint further emphasizes the connection between Petitioners, alleging that Hyson's "sole shareholders are precisely [RBI] and [RBC]." *Id.* at 11. Respondent's agency allegations are thus far from "generalized," and he cannot renounce them now.

"Courts have generally applied the agency principle to prevent parties from evading arbitration obligations by suing a signatory's agents instead of the principal." *Soto v. Am.*

*Honda Motor Co.*, 946 F. Supp. 2d 949, 956 (N.D. Cal. 2012). The Court sees no reason why the same concept should not bar Respondent from dodging the Agreement by suing the agents *and* the principal. Accordingly, Hyson and RBI are entitled to compel arbitration of the claim raised in Respondent's Complaint.

## V. The Anti-Suit Injunction

Petitioners ask the Court to enjoin Respondent from continuing to prosecute his case in the Mexico Proceedings. "A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (quoting *Seattle Totems Hockey Club, Inc.* v. *Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir.1981)).

In the Ninth Circuit, courts ask three questions—the first of which has multiple parts—when evaluating requests for a foreign anti-suit injunction: (1) whether "'the parties and the issues are the same' in both the domestic and foreign actions," *and* whether "the first action is dispositive of the action to be enjoined"; (2) "whether at least one of the so-called '*Unterweser* factors' applies"; and (3) "whether the injunction's 'impact on comity is tolerable.'" *Id.* (quoting *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir. 2006)). As with other forms of injunctive relief, Petitioners bear the burden of establishing that an anti-suit injunction is warranted. *See Interdigital Tech. Corp. v. Pegatron Corp.*, No. 15-CV-02584-LHK, 2015 WL 3958257, at *3 (N.D. Cal. June 29, 2015); *MWK Recruiting Inc. v. Jowers*, 833 F. App'x 560, 562 (5th Cir. 2020).

"In cases like this where the parties are the same," the remaining requirements of the inquiry's first step—"whether the issues are the same and the first action dispositive of the action to be enjoined"—are "interrelated." *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009). The analysis called for is "functional"—not "technical or formal." *Microsoft*, 696 F.3d at 882. The central question is whether "all the issues in the foreign action . . . can be resolved in the local action." *Id.* at 882–83 (alteration in original) (quoting *Applied Med.*, 587 F.3d at 915).

Applying the above framework to the instant case is not particularly straightforward. The Court has already determined that the Parties' Agreement must be enforced, and that the Agreement delegates arbitrability issues to the arbitrator. Accordingly, the Court's Order will require the Parties to arbitrate *arbitrability* in accordance with the Agreement. The Court does not, however, decide whether Respondent's wrongful termination claim is *actually* arbitrable. In other words, whether Respondent's claim *can* be resolved domestically in arbitration will remain an open question until the arbitrator answers it.[8] Notably, that process appears to be underway;[9] Respondent has raised his choice of law and validity arguments in AAA proceedings initiated by Petitioners. *See* Opp'n at 13.

The Parties have not identified any Ninth Circuit cases discussing anti-suit injunctions in the context of petitions to compel arbitration. The Second Circuit confronted a related question in *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645 (2d Cir. 2004). There, the court wrote,

> The case before the enjoining court here concerns the arbitrability of the parties' claims; therefore the question . . . is whether the ruling on arbitrability is dispositive of the [foreign] litigation, even though the underlying disputes are confided to the arbitral panel and will not be decided by the enjoining court.

*Id.* at 653. But *Paramedics* is distinguishable; here, the Court is not—and indeed cannot—rule on the arbitrability of Respondent's claim. As a result, *Paramedics* does not suggest that resolving the Petition addresses the issues at stake in the foreign action.

The Court need not decide how *Microsoft*'s framework applies, however, as Petitioners have not carried their burden. The Petition does not discuss the prerequisites for granting an anti-suit injunction whatsoever. Only after Respondent raised the issue, *see*

---

[8] The Parties did not raise the issue of whether the arbitrator might have the power to grant an anti-suit injunction—a question some courts have considered—after determining whether Respondent's claims are arbitrable. *See Citigroup Inc. v. Villar*, No. 219CV05310GWFFMX, 2021 WL 3184545, at *2 (C.D. Cal. Apr. 30, 2021). The Court thus does not address that possibility here.

[9] Per Petitioners, the pending arbitration proceeding is entitled *Ensambles Hyson S.A. de C.V.; Rain Baird Corporation, et al. v. Francisco Javier Sanchez*, Am. Arbitration Ass'n Case No. 01-23-0004-3948.

Opp'n at 27–28, did Petitioners address it, *see* Reply at 10–11.  Even then, Petitioners provided scant analysis and certainly did not engage with the legal complexities identified above.  The Reply simply states, without further explanation, that "the arbitrator will resolve the sole issues involved in the Mexico proceedings."  *Id.* at 10.  Petitioners cite only *Ibeto Petrochemical Indus. Ltd. v. M/T Beffen* for support, but that case is distinguishable for the same reason as *Paramedics*.  *See* 475 F.3d 56, 64–65 (2d Cir. 2007).  Petitioners thus falter at the inquiry's first step, which is a "threshold consideration" Petitioners must satisfy before proceeding to the rest of the analysis.  *See Microsoft*, 696 F.3d at 882.

## CONCLUSION

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the Petition (ECF No. 1).  The Court **GRANTS** the Petition to the extent it seeks to compel arbitration.  Respondent is ordered to submit his claims to arbitration in accordance with the Parties' Arbitration Agreement.  The Court **DENIES** Petitioners' request for an anti-suit injunction without prejudice to Petitioners filing a renewed motion for a preliminary injunction.  If no such motion is filed in accordance with Civil Local Rule 7.1 within thirty (30) days of the date of this Order, the Court will issue an order administratively closing this action.

**IT IS SO ORDERED.**

Dated:  February 23, 2024

Hon. Janis L. Sammartino
United States District Judge