UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENSAMBLES HYSON, S.A. DE C.V.; RAIN BIRD CORPORATION; and RAIN BIRD INTERNATIONAL, INC., | Case No.: 23-CV-1887 JLS (KSC) |
| Petitioners, | **ORDER DENYING RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| FRANCISCO JAVIER SANCHEZ, | (ECF No. 16) |
| Respondent. | |

Presently before the Court is the Renewed Motion for a Preliminary Injunction ("Mot.," ECF No. 16) filed by Petitioners Ensambles Hyson, S.A. de C.V. ("Hyson"); Rain Bird Corporation ("RBC"); and Rain Bird International, Inc. ("RBI") (collectively, "Petitioners"). Respondent Francisco Javier Sanchez submitted an Opposition to the Motion ("Opp'n," ECF No. 18), and Petitioners filed a Reply ("Reply," ECF No. 19). The Court previously took this matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). *See* ECF No. 20. Having carefully considered the Parties' arguments and the law, the Court **DENIES** the Motion **WITHOUT PREJUDICE**.

## BACKGROUND

The Court provided a thorough recitation of this action's history in its February 23, 2024 Order (the "Order," ECF No. 15). For ease of reference, the Court

repeats the relevant details below with the addition of more recent developments.

## I.   Respondent's Employment

Petitioners comprise a set of interrelated companies.  RBC is a global manufacturer and provider of irrigation products and services incorporated and headquartered in California.  Decl. Laurie Manahan Supp. Pet. ("Manahan Decl.") ¶ 2, ECF No. 5.  The company has locations in multiple states and countries, including a facility in Mexico.  *Id.* RBI, also located in California, is the wholly owned subsidiary of RBC.  *Id.* ¶ 3.  RBI, in turn, is the majority owner of Hyson, a company in Mexico that provides manufacturing and assembly services to RBC.  *Id.* ¶ 4.

Respondent was hired by RBC as a "Materials Manager" in 2005.  *Id.* Ex. 2 at 2.[1] With his offer letter, RBC sent Respondent a copy of the company's "Dispute Resolution Program," *id.* Ex. 3 at 2–13, and an "Agreement to Arbitrate Claims," *id.* at 14–17.  The latter document, hereinafter referred to as the "Arbitration Agreement" or "Agreement," mandates that "[a]ny and all . . . claims . . . arising out of or relating to employee's employment or its termination at the Company" be "settled exclusively by final and binding arbitration pursuant to the Federal Arbitration Act" ("FAA").  *Id.* at 15.  The Agreement further specifies that the arbitration proceedings "shall be conducted in accordance with the then-current arbitration rules of the American Arbitration Association ("AAA") or the Judicial Arbitration and Mediation Services" ("JAMS"), depending on which rules the party initiating arbitration selects.  *Id.*  Respondent signed the Agreement on November 6, 2005.  *Id.* at 17.

Respondent remained employed by Petitioners for sixteen years.  *See* Decl. Francisco Javier Sanchez Supp. Opp'n to Pet. ("Sanchez Decl.") ¶ 10, ECF No. 13-2. During that time, Respondent worked almost exclusively in Mexico, where he managed a plant owned and operated by Hyson.  *Id.* ¶ 4.  Respondent did, however, attend work

---

[1] Pin citations to docketed material in this Order, including the Parties' briefs, refer to the blue CM/ECF page numbers stamped along the top margin of each document.

meetings in the United States on a regular, albeit infrequent, basis.  *Id.* ¶ 8; Pet. & Compl. ("Pet.") ¶ 15, ECF No. 1.  Respondent resided in Chula Vista, California while employed by Petitioners.  Manahan Decl. ¶ 8.

On April 8, 2021, while on the job at Hyson's plant in Mexico, Respondent was fired.  *Id.* ¶ 6; Sanchez Decl. ¶ 10.

## II.   Respondent Brings Suit in Mexico

Shortly after he was let go, Respondent initiated a wrongful termination action against Petitioners by filing a complaint with the Local Conciliation and Arbitration Board[2] (the "Labor Board") in Tijuana, Mexico.  Decl. Blanca Irene Villaseñor Pimienta Supp. Opp'n to Pet. ("Villaseñor Decl.") ¶ 7, ECF No. 13-1.  After these proceedings (the "Mexico Proceedings") commenced, Hyson was served with process on May 19, 2021, while RBC and RBI were served on February 16, 2023.  *Id.*

On March 24, 2023, Hyson filed a motion challenging the Labor Board's jurisdiction over Respondent's suit.  *Id.* Ex. 9 at 77.  Hyson argued the case involved an employment relationship between Respondent and "foreign entities" RBC and RBI, so the laws of Mexico could not apply.  *Id.* at 78.  The Labor Board deemed Hyson's motion "unfounded" on April 3, 2023.  *Id.* at 79.

## III.   Petitioners Initiate the Instant Action

Petitioners initiated this action on October 16, 2023.  They sought to compel Respondent to raise his claims in arbitration proceedings conducted by the AAA.  *See id.* at 11.  Petitioners also asked the Court to issue an anti-suit injunction requiring Respondent to "cease the prosecution of and dismiss" the Mexico Proceedings.  *Id.*

In his Opposition to the Petition ("Opp'n to Pet.," ECF No. 13), Respondent did not contest the existence of the signed Arbitration Agreement.  Respondent did, however, argue (1) the Court could decide whether his claims were arbitrable; (2) the Agreement was

---

[2] Though the name may suggest otherwise, local conciliation and arbitration boards are not private arbitration tribunals.  Rather, they are government agencies in Mexico with "exclusive and binding jurisdiction to hear all disputes involving employees and their employers."  Villaseñor Decl. ¶ 5.

invalid and unenforceable under Mexican law, which Respondent contended should apply to his wrongful termination claim; (3) Petitioners waived their right to arbitrate given their years-long delay in raising the issue; (4) Hyson and RBI, as non-signatories, could not enforce the Agreement; and (5) Petitioners had failed to establish their right to an anti-suit injunction. *See generally* Opp'n to Pet.

After reviewing the Parties' arguments, the Court granted the Petition to the extent Petitioners sought to compel Respondent to participate in arbitration. The Court first determined the Parties had clearly and unmistakably delegated questions of arbitrability to the arbitrator by incorporating the AAA's rules into the Agreement. *See* Order at 5–9. Based on that finding, the Court concluded Respondent's choice-of-law argument and his challenges to the validity and enforceability of the Agreement as a whole had to be addressed by an arbitrator. *Id.* at 9–10. And though Hyson's decision to let the Mexico Proceedings chug along for nearly three years before pursuing arbitration raised the Court's eyebrows, the Court rejected Respondent's waiver contention given his failure to identify any litigation conduct constituting waiver beyond mere delay. *See id.* at 10–14. Respondent's nonsignatory argument also fell flat. *See id.* at 14–16.

Still, the Court denied Petitioners an anti-suit injunction. The Court noted that, under Ninth Circuit law, Petitioners could not secure such an injunction without establishing, among other things, that the domestic proceedings were dispositive of the action in Mexico. *See id.* at 17 (citing *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012)). The Court explained that conducting this inquiry was complicated by the delegation clause contained in the Parties' Arbitration Agreement. *See id.* at 18. And because Petitioners had not dipped so much as a toe into those murky legal waters, the Court declined to wade further into the issue. Instead, the Court denied Petitioners' injunctive relief request without prejudice for failing to satisfy their burden. *See id.* at 18–19.

## IV.    Recent Developments

The Mexico Proceedings have progressed rapidly since the Parties last updated the Court. On February 12, 2024—after the Petition was fully briefed but just before the Court

issued its prior Order—a "full hearing and trial on the matter in the Mexic[o] Proceedings" took place. Decl. Alberto Sanchez Lujan Supp. Opp'n ("Lujan Decl.") ¶ 4, ECF No. 18-1. Petitioners apparently participated fully in the trial without raising the Agreement as a defense. *Id.* After trial, Respondent submitted "his final arguments" to the Labor Board. *Id.* ¶ 5. Save for Petitioners filing their own final written arguments, the Parties have nothing left to do in the Mexico Proceedings but wait for the Labor Board's decision. *Id.*

The arbitration proceedings (the "U.S. Arbitration Proceedings") have also moved forward in California.[3]  On March 18, 2024, the Parties held a conference call with the arbitrator "wherein proceedings and scheduling issues were to be discussed." Osuna-Gonzalez Decl. ¶ 6. Respondent's counsel anticipated that a briefing schedule regarding arbitrability would issue at that time. *See id.* However, during the call, Petitioners argued that Respondent's chosen attorney could not represent him in the U.S. Arbitration Proceedings. *Id.* Petitioners' challenge was set for a hearing on April 18, 2024. *See id.* ¶ 9. It appears the arbitrator will not make a decision on arbitrability until the matter of Respondent's representation is resolved. *Id.* ¶ 7.

Petitioners filed the instant Motion on March 20, 2024—two days after the conference call in the U.S. Arbitration Proceedings took place. Interestingly, Petitioners moving papers are silent regarding the above developments in the Mexico Proceedings and U.S. Arbitration Proceedings. *See generally* Mot.; Reply.

## LEGAL STANDARD

"A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly." *Microsoft*, 696 F.3d at 881 (quoting *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981)). Such anti-suit injunctions operate *in personam*: "the American court enjoins the claimant, not the foreign

---

[3] The Parties are presently in arbitration in an action filed with the American Arbitration Association: *Ensambles Hyson, S.A. de C.V. v. Sanchez*, AAA Case No.: 01-23-0004-3948. Decl. Alejandro Osuna-Gonzalez Supp. Opp'n ("Osuna-Gonzalez Decl.") ¶ 4, ECF No. 18-2.

court." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006).

The Ninth Circuit articulated its three-part inquiry for evaluating the propriety of foreign anti-suit injunctions in *Gallo*. This test supplants "the likelihood-of-success aspect of the traditional preliminary injunction" analysis. *Microsoft*, 696 F.3d at 884. As with other forms of injunctive relief, however, the moving party bears the burden of establishing that an anti-suit injunction is warranted. *See Interdigital Tech. Corp. v. Pegatron Corp.*, No. 15-CV-02584-LHK, 2015 WL 3958257, at *3 (N.D. Cal. June 29, 2015); *MWK Recruiting Inc. v. Jowers*, 833 F. App'x 560, 562 (5th Cir. 2020).

Courts undertaking *Gallo*'s inquiry first ask whether "'the parties and the issues are the same' in both the domestic and foreign actions, and 'whether the [domestic] action is dispositive of the action to be enjoined.'" *Microsoft*, 696 F.3d at 881 (quoting *Gallo*, 446 F.3d at 991). These constitute "threshold consideration[s]" that parties seeking anti-suit injunctions must satisfy to proceed to the rest of the analysis. *See id.* at 882.; *see also Zynga, Inc. v. Vostu USA, Inc.*, No. 11-CV-02959-EJD, 2011 WL 3516164, at *3 (N.D. Cal. Aug. 11, 2011) ("Anti-suit injunctions are *only* appropriate when the domestic action is capable of disposing all of the issues in the foreign action . . . ." (emphasis added) (citing *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009))).

Next, courts evaluate whether any of the "*Unterweser* factors" apply.[4] *Microsoft*, 696 F.3d at 881–82. These factors include "whether the foreign litigation would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations." *Id.* at 882 (alterations adopted) (quoting *Gallo*, 446 F.3d at 990). The list is disjunctive; any of the *Unterweser* factors may justify an anti-suit injunction. *See id.* at 881.

/ / /

---

[4] These factors were first articulated in *In re Unterweser Reederei, Gmbh*, 428 F.2d 888, 896 (5th Cir. 1970), *aff'd on reh'g*, 446 F.2d 907 (5th Cir. 1971) (en banc), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972).

23-CV-1887 JLS (KSC)

Finally, courts consider "whether the impact on comity would be tolerable." *Applied Med.*, 587 F.3d at 919 (quoting *Gallo*, 446 F.3d at 994). "[N]either a matter of absolute obligation" nor "mere courtesy and goodwill," *id.* at 920 (quoting *Asvesta v. Petroutsas*, 580 F.3d 1000, 1010–11 (9th Cir. 2009)), international comity is "a complex and elusive concept" that must be approached with finesse and evaluated in context, *Microsoft*, 696 F.3d at 886 (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)). Relevant considerations include the scope of the requested injunction and whether the dispute implicates "public international law or government litigants." *Id.* at 887.

## ANALYSIS

So far as the Court can tell, how *Gallo*'s tripartite test applies to cases involving arbitration agreements that contain delegations of arbitrability is a question of first impression in this Circuit. After marching through this relatively untouched legal landscape, the Court concludes Petitioners have failed to satisfy *Gallo*'s threshold inquiry. And even were that not so, Petitioners would stumble at each of the test's remaining steps.

## I.  Step 1: Overlap Between the Domestic and Foreign Actions

"In cases like this where the parties are the same," the remaining threshold requirements—"whether the issues are the same and the first action dispositive of the action to be enjoined"—are "interrelated." *Applied Med.*, 587 F.3d at 915. The analysis called for is "functional," not "technical or formal." *Microsoft*, 696 F.3d at 882. The essential question is whether "all the issues in the foreign action . . . can be resolved in the local action." *Id.* at 882–83 (alteration in original) (quoting *Applied Med.*, 587 F.3d at 915). How this question should be answered in this case—where the Arbitration Agreement delegates arbitrability to the arbitrator—is not immediately clear. The Parties cite two cases from outside of this Circuit that have tackled this issue.[5] Unfortunately, neither

---

[5] These cases are *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390 (S.D.N.Y. 2018), and *Citigroup Inc. v. Sayeg Seade*, No. 21 CIV. 10413 (JPC), 2022 WL 179203 (S.D.N.Y. Jan. 20, 2022).

proves persuasive in light of Ninth Circuit precedent, and the Court is not aware of any other procedurally on-point cases.  Still, the Court is not without some guidance.  Based on a thorough review of the case law, the Court holds that an anti-suit injunction cannot be granted to enforce an arbitration agreement until questions of arbitrability are settled.

### A.   *Ninth Circuit Precedent*

The Ninth Circuit most recently addressed anti-suit injunctions in three cases: *Gallo*, *Applied Medical*, and *Microsoft*.  The first two revolve around forum selection clauses, while the third applies its predecessors in a different context.

#### 1.   Gallo

In *Gallo*, a U.S.-based winery and an Ecuadorian distributor signed an agreement containing "forum selection and choice-of-law clauses in favor of California."  446 F.3d at 987.  Nevertheless, the distributor brought a breach of contract action in Ecuador, which prompted the winery to ask a California district court to enjoin the distributor from prosecuting the Ecuadorian suit pursuant to the forum selection clause.  *See id.* at 988, 991. The district court denied the winery's request, concluding "the claims" in the foreign and domestic actions "were not the same because the . . . cases arose from different acts."  *Id.* at 991.  On appeal, the Ninth Circuit reversed.

*Gallo*'s brief discussion of the threshold criteria for anti-suit injunctions concentrated on the overlap between issues raised abroad and at home.  The court found that because the Ecuadorian action was for breach of contract, and the winery sought "a declaration that [it] did not breach [the contract]," *id.*, "both causes of action focused on whether the distributorship agreement had been breached," *Applied Med.*, 587 F.3d at 913–14 (summarizing *Gallo*).  So, per *Gallo*, "all the issues before the court in the Ecuador action [were] before the court in . . . California."  446 F.3d at 991.

Though not acknowledged explicitly in *Gallo*, that the foreign-raised claims centered on the parties' contract necessarily meant the forum selection clause—requiring disputes to be heard in California—applied to the issues raised in Ecuador.  *Gallo*'s treatment of the *Unterweser* factors reflects this conclusion, as "the district court['s]

8

h[olding] that the forum selection clause was valid and enforceable" drove the analysis. *Id.* at 991–92.

### 2.  Applied Medical

*Applied Medical* involved another distributorship agreement containing California forum-selection and choice-of-law clauses. *See* 587 F.3d at 911. When a contract dispute arose, the foreign distributor sought relief in Belgium, and the domestic supplier responded by suing in federal court. *See id.* at 912. The supplier moved to enjoin the distributor from prosecuting the Belgian suit, but the district court denied the request because "the Belgian claims . . . were 'potentially broader' than the issues under consideration [in federal court]." *Id.* at 913. Again, the Ninth Circuit reversed.

*Applied Medical* elaborated on *Gallo*'s threshold inquiry and emphasized the role played by the forum selection clause in the analysis. The question was not, per the court, whether the issues raised by Belgian and domestic law were identical. *Id.* at 914. Rather, "the crux of the functional inquiry . . . is to determine whether the issues are the same in the sense that all the issues in the foreign action [1] fall under the forum selection clause and [2] can be resolved in the local action." *Id.* at 915.

The first element of this test was met, as the claims in the Belgian action "[were] subject to the forum selection clause." *Id.* at 916. This conclusion depended on the resolution of merits issues in the underlying contractual dispute (i.e., the interpretation and application of the forum selection clause). The contract specified: "The federal and state courts within the State of California shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement." *Id.* at 911. So, to determine the threshold requirements for an anti-suit injunction were met, the court had to find (and did find) that the Belgian claims "s[ought] damages that occur[red] 'only as a result of [contract] termination,' concern[ed] the applicability of [another contractual] provision, and therefore [were] disputes '*arising out of th[e] Agreement*.'" *Id.* at 916 (emphasis added but final alteration in original).

/ / /

The "dispositive" element was also satisfied as, by function of the forum selection clause, the distributor's claims could only "be disposed of in the California forum if at all." *Id.* True, at the outset of the domestic case—before any choice-of-law determinations were made—the distributor could feasibly have sought to vindicate rights granted only by Belgian law. But the presence of foreign legal questions does not always bear on whether a domestic action can "resolve" certain claims.[6] The U.S.-based case in *Applied Medical* remained "dispositive in the sense that" the district court was the only proper forum for raising *any* claims—domestic or foreign, whether ultimately successful or meritless from the start—arising from the contract. *See id.* at 918 ("[I]t is sufficient that the federal action . . . is the proper action and forum for disposing of the [foreign] action.").

### 3. Microsoft

Unlike its predecessors, *Microsoft* does not involve a forum selection clause. In brief, Motorola had, in declarations to a third party, agreed to license certain patents "to all comers" on reasonable terms. *See Microsoft*, 696 F.3d at 875–76. Motorola later approached Microsoft with an offer to license particular patents. *See id.* at 877. Microsoft sued Motorola for breach of contract in federal court, arguing it was a third-party beneficiary of Motorola's prior commitments and that "Motorola's proposed royalty terms were unreasonable." *Id.* at 878. In response, Motorola brought a patent infringement action in Germany and eventually won an injunction against Microsoft. *See id.* at 879. However, the U.S. district court "enjoin[ed] Motorola temporarily from enforcing [the German] injunction." *Id.* at 875. On interlocutory appeal, the Ninth Circuit affirmed.

Though *Microsoft* presented distinct facts, the threshold inquiry did not change because the focus remained on contract enforcement. *Gallo* and *Applied Medical* were motivated by the same idea: "Courts should give effect to freely made contractual agreements." *Id.* at 885. This "broader principle" applied in *Microsoft*, too; though the

---

[6] As *Gallo* explained, district courts can and do apply foreign substantive law when cases so require. *See* 446 F.3d at 991 ("[T]o the degree that Ecuadorian law does apply, federal courts are capable of applying it to [the distributor's] claims.").

23-CV-1887 JLS (KSC)

agreement at issue lacked a forum selection clause, it was still a contract.  *Id.*  So, just as *Applied Medical* asked if "all the issues in the foreign action can be resolved in the local action," *id.* at 882–83 (alteration adopted) (quoting *Applied Med.*, 587 F.3d at 915), the question in *Microsoft* became whether "all the issues in the German patent action c[ould] be resolved in the U.S. contract action," *id.* at 883.

 *Microsoft*'s framing highlights two important aspects of *Gallo*'s initial step.  The first, that the specific contours of the foreign and domestic actions matter, is nothing new; *Gallo* and *Applied Medical* established the necessity of defining the issues at stake domestically and abroad.  In *Microsoft*, the issue in the foreign action was the enforcement of an injunction prohibiting Microsoft from selling products that allegedly infringed on Motorola's German patents.  *See id.* at 879.  Meanwhile, in the States, Microsoft argued the injunction was at odds with Motorola's commitment to license its patents on reasonable terms.  *See id.* at 884–85.

 *Microsoft*'s second lesson is that the merits of the underlying contractual dispute cannot be ignored when considering an anti-suit injunction.  The *Microsoft* court asked whether the domestic breach-of-contract claims "would, if decided in favor of Microsoft, determine the propriety of the enforcement by Motorola of the injunctive relief obtained in Germany."  *Id.* at 885.  And to answer this question, the Ninth Circuit had to evaluate the district court's ruling, made at summary judgment, that there "[*was*] a contract," "enforceable by Microsoft," that "encompasse[d] . . . the patents at issue in the German suit."  *Id.* (emphasis in original).  *Microsoft* thus made explicit what its predecessors had only implied: "the threshold anti-suit injunction inquiry" is "intrinsically bound up with . . . the merits of the contract dispute."  *Id.* at 884.

    4. *Summary of the Relevant Principles*

 From the foregoing cases, the same-issues/dispositive inquiry can be summarized as follows: courts must ask whether all the issues in the foreign action (1) are encompassed by the specific contractual promise invoked in the domestic action; and (2) would be resolved if the domestic action were decided in favor of the party seeking the injunction.

23-CV-1887 JLS (KSC)

The elements of this test are "interrelated" in that both are inescapably connected to the merits of the underlying contract-based questions before the domestic court. This makes sense given *Microsoft*'s emphasis on the enforcement of "freely made" contracts. *Id.* at 885. And to give effect to such a contract—and thereby determine whether it applies to and/or would dispose of issues raised in a foreign case—the court must evaluate its scope and enforceability. *See Applied Medical*, 587 F.3d at 916 (investigating whether foreign claims fell within the scope of an enforceable forum selection clause); *Microsoft*, 696 F.3d at 884 (asking if Motorola's agreements "created a contract that Microsoft c[ould] enforce" as to patents relevant in the foreign action).

Conducting this inquiry may require courts to carefully define the issues at stake in the domestic and foreign actions. While cases will sometimes overlap in obvious ways, *see Gallo*, 446 F.3d at 991 (concluding central question of both cases was whether the parties' contract had been breached); *Applied Med.*, 587 F.3d at 916–17 (similar), an anti-suit injunction may be appropriate even when the foreign and domestic claims appear less symmetrical on initial inspection, *see Microsoft*, 696 F.3d at 883–85 (affirming grant of anti-suit injunction, though the case did not involve parallel U.S. *patent* claims and German patent claims, given the link between the U.S. *contract* claims and German patent claims).

### B.   Problems Posed by Arbitration Agreements Containing Delegation Clauses

Forum selection clauses are close cousins of arbitration agreements, which suggests *Gallo*'s framework should translate easily from one context to the other. That said, actions to compel arbitration are mechanistically distinct from suits seeking to enforce other contractual provisions; arbitration agreements contemplate a division of adjudicative labor, reserving some issues for arbitration that district courts would otherwise decide. The degree to which this allocation of responsibilities impacts the anti-suit injunction analysis turns on whether the arbitration agreement delegates issues of arbitrability to the arbitrator.

#### 1.   Anti-Suit Injunctions and Arbitration Agreements, Generally

Though the Ninth Circuit has not squarely addressed the question, the Court does not doubt that anti-suit injunctions are, under the right circumstances, available to enforce

arbitration agreements. Courts should give effect to "freely made" contracts, *id.* at 885, and there is no obvious reason to discriminate between, say, forum-selection and arbitration clauses in the context of anti-suit injunctions. Indeed, *Gallo* noted that arbitration, forum-selection, and choice-of-law clauses all serve similar purposes: they "specify 'in advance the forum in which disputes shall be litigated and the law to be applied.'" 446 F.3d at 993 (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516 (1974)). *Gallo* also favorably cited to a Second Circuit opinion that "affirmed an anti-suit injunction where foreign proceedings breached an arbitration clause." *Id.* (citing *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653–55 (2d Cir. 2004)). It is therefore not surprising that district courts in this Circuit have applied *Gallo* and company in cases involving arbitration.[7]

Compared to other contractual devices, arbitration agreements are in some ways unique. In many non-arbitration cases, like *Applied Medical* or *Microsoft*, a federal court may, over time, perform three functions relevant here: (1) determine if a contract between the parties exists; (2) determine if the parties' claims are subject to the operative provision(s) of the contract (e.g., forum selection clause); and (3) preside over the resolution of the underlying claims (e.g., breach of contract). By contrast, courts deciding whether to compel arbitration typically handle only the first two "gateway" tasks: deciding "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Arbitration agreements thus separate a district court's decision to compel arbitration from an arbitrator's jurisdiction over the merits of the underlying dispute.

Divvying up adjudicative duties is not inherently problematic for purposes of anti-suit injunctions. Indeed, courts need only answer *Brennan*'s two gateway questions to

---

[7] *See Mastronardi Int'l Ltd. v. SunSelect Produce (Cal.), Inc.*, 437 F. Supp. 3d 772, 778–81 (E.D. Cal. 2020) (evaluating request to enjoin party from proceeding with foreign arbitration using the Ninth Circuit's three-step framework); *Abudawood v. Leon*, No. 8:23-CV-02448-JLS-JDE, 2024 WL 1557324, at *4–5 (C.D. Cal. Apr. 10, 2024) (granting anti-suit injunction aimed at preventing party from invalidating judicially-confirmed arbitral award through foreign litigation).

conduct *Gallo*'s threshold inquiry.  An analogy to forum selection clauses illustrates this. *Applied Medical* held that a domestic action was dispositive of the foreign one because all claims in the foreign case were "subject to the forum selection clause" and thus could only "be disposed of in the [domestic] forum if at all."  587 F.3d at 916.  Similarly, by finding that an arbitration agreement both exists *and* covers the foreign dispute, a district court "disposes of the [foreign] action because the [foreign] litigation concerns issues that, by virtue of the . . . court's judgment, *are reserved to arbitration*."  *Paramedics*, 369 F.3d at 653 (emphasis added).  That the "underlying disputes are confided to the arbitral panel and will not be decided by the enjoining court" is of no consequence.  *Id.*

### 2.  *Challenge Created by Delegations of Arbitrability*

Some arbitration agreements further narrow the role courts can play.  Specifically, parties may "delegate" issues of "arbitrability" to arbitrators so long as they do it clearly and unmistakably.  *See Brennan*, 796 F.3d at 1130.  Arbitrability is a deceptively broad term; it encompasses such issues as "whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all."  *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029  (9th Cir. 2022) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)).  And courts may not muscle in where they are not wanted. When parties decide to delegate arbitrability, "courts *must* respect [that] decision."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 71 (2019) (emphasis added).

An arbitrability delegation throws a spanner in the works of the threshold anti-suit injunction inquiry.  As an enforceable delegation clause "commits to the arbitrator *nearly all* [arbitrability] challenges," *Caremark, LLC*, 43 F.4th at 1029 (emphasis added), courts faced with an arbitration agreement containing such a clause are, for present purposes, limited to one job: deciding whether the agreement exists, *see id.* at 1030.[8]  These courts thus lose the ability to decide questions key to *Gallo*'s first step, like whether issues raised

---

[8] Courts "must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability."  *Caremark, LLC*, 43 F.4th at 1030.  But no such challenge is currently before the Court.

in a foreign action fall within the scope of the arbitration agreement or whether that agreement is valid and enforceable as applied to the claims raised abroad.

### C.  Petitioners' Proposed Solution

Seeking to overcome the doctrinal difficulties in this case, Petitioners contend an anti-suit injunction is appropriate because, given this Court's prior rulings on the delegation of arbitrability, it is "highly probable" that Respondent's claims will be subject to arbitration. Mot. at 13. The viability of Petitioners' argument depends on how one defines the issues a domestic action "*can . . .* resolve[]" or "*is capable* of" resolving. *Applied Med.*, 587 F.3d at 915 (emphasis added). There are two plausible interpretations. One possibility: a domestic action is "capable" of disposing of all issues it *might* resolve. This more relaxed take would benefit Petitioners; by ordering the Parties to arbitrate arbitrability, the Court at a minimum introduced the possibility that Respondent's claims are reserved to arbitration. On the other hand, "capable" could be understood to require certainty. Under this stricter approach, an anti-suit injunction would be proper only after the district court became *sure* that the issues raised in the foreign action would be resolved—one way or another—by the domestic proceedings. As a matter of precedent and policy, this Court will take the latter view.

#### 1.  Precedent

In pushing for the more permissive understanding of "capable," Petitioners rely heavily on *Citigroup Inc. v. Sayeg Seade*, No. 21 CIV. 10413 (JPC), 2022 WL 179203 (S.D.N.Y. Jan. 20, 2022). When addressing the threshold requirements for an anti-suit injunction in a case involving a delegation clause, the *Citigroup* court asked whether *some* claims raised in the foreign action were *likely* subject to arbitration:

> [T]he arbitration that this Court compels today *may* dispose of claims pending in the Mexican Action. *If* the arbitrator rules for Citigroup that the scope of arbitrability includes *some* of the claims brought in the Mexican Action, that means that *certain* claims pending in the Mexican Action "are reserved to arbitration and cannot be litigated." And here, given that the complaint in the Mexican Action includes claims brought under

the [Parties' Agreements], it *seems highly probable* that the arbitrator will conclude that *at least some* claims in the Mexican Action can be brought only in Arbitration pursuant to the arbitration provisions of the . . . Agreements.

2022 WL 179203, at *8 (emphasis added and internal citations omitted).

The Court doubts, however, whether *Citigroup*'s tentative inquiry into arbitrability (i.e., whether claims were *likely* arbitrable) is compatible with *Gallo* and its descendants.[9] True, the Ninth Circuit has not explicitly addressed this issue. Still, the court has repeatedly asked if "the issues in the foreign action [*do*] fall under the [contract] and *can* be resolved in the local action," *Applied Med.*, 587 F.3d at 915 (emphasis added), not whether those issues are *probably* subject to the agreement and *might* be amenable to resolution locally. Likewise, the Ninth Circuit has premised anti-suit injunctions on definitive rulings regarding the scope of the parties' agreement and legal claims. *See id.* at 916–17 (reversing denial of injunction where "the district court *already held* that [the parties'] disputes" were subject to the contract (emphasis added)); *Microsoft*, 696 F.3d at 878, 883–84 (affirming injunction based on lower court's findings, made at summary judgment, that Motorola had entered into a contract that was enforceable and reached the at-issue patents).[10]

### 2. Policy

The Court is also persuaded to take the narrower view of the capable-of-resolving inquiry as a matter of policy. Explaining why requires a brief detour into the roots of

---

[9] *Citigroup* also clashes with Ninth Circuit authority by asking if one action is dispositive of *some*—rather than *all*—issues raised in another. *See Applied Med.*, 587 F.3d at 915 (evaluating whether "the domestic action is capable of disposing of *all* the issues in the foreign action" (emphasis added)); *Nike, Inc. v. Cardarelli*, No. 3:14-CV-01690-BR, 2015 WL 853008, at *5 (D. Or. Feb. 26, 2015) ("A close reading of [*Gallo*, *Applied Medical*, and *Microsoft*] indicates . . . that in order to satisfy the first prong of the anti-suit injunction analysis in this Circuit, Plaintiff must show this action is capable of resolving the *entire* [Foreign] Action." (emphasis added)).

[10] *Microsoft* includes language that might appear to endorse *Citigroup*'s test. *See* 696 F.3d at 884 (explaining the need for "a ballpark, tentative assessment of the merits"). But *Microsoft* was discussing the typical bounds of an interlocutory appeal, not the district court's initial decision. *See id.* (explaining the court could not decide "whether the district court's partial summary judgment . . . was proper," but instead was limited to evaluating the lower court's decision for "fundamental[] legal[] error[]").

16

*Gallo*'s threshold inquiry, which are found in *Seattle Totems*.  *See Gallo*, 446 F.3d at 991 (introducing the threshold inquiry and citing district court case that had "inferr[ed] such a test from . . . *Seattle Totems*").

In *Seattle Totems*, the Ninth Circuit connected the same-issues-and-same-parties question to the consequences of vexatious parallel proceedings.  The court concluded that "[a]djudicating th[e] [same] issue in two separate actions [was] likely to result in unnecessary delay and substantial inconvenience and expense," and could also "result in inconsistent rulings or even a race to judgment."  *Seattle Totems*, 652 F.2d at 856.

Notably, *Seattle Totems*' focus on vexatious litigation does not directly translate to the modern version of *Gallo*'s first step.  While *Seattle Totems* implies it is necessary to compare the foreign and domestic suits at the outset of the anti-suit injunction analysis, *see Gallo*, 446 F.3d at 991, the court discussed the topic only in relation to the *Unterweser* factors, *see Seattle Totems*, 652 F.2d at 856.  And since *Seattle Totems*, the Ninth Circuit has continued to examine concerns regarding inefficient litigation in the *second* step of the anti-suit injunction test.  *See Gallo*, 446 F.3d at 992–93; *Applied Med.*, 587 F.3d at 918–19; *Microsoft*, 696 F.3d at 886.

Nevertheless, *Seattle Totems* remains instructive.  As courts have observed, the factors *Seattle Totems* considered are also implicated by the doctrine of *forum non conveniens*.  *See, e.g.*, *Laker*, 731 F.2d at 928 & n.55 (citing *Seattle Totems*, 652 F.2d at 856).  And case law on anti-suit injunctions and *forum non conveniens* motions share another policy concern: ensuring parties are not inadvertently left without recourse.  As one commentator explains in an article cited with approval by the Ninth Circuit,[11] "The traditional view expressed in the American cases . . . [(]that courts will not consider issuing anti-suit injunctions" absent "parallel local and foreign actions between the same parties

---

[11] In *Gallo*, the Ninth Circuit cited favorably to Bermann's article in its discussion of the initial step of the anti-suit injunction test.  *See* 446 F.3d at 991.  Other circuit courts have also done so.  *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir. 2004); *Canon Latin Am., Inc. v. Lantech (CR), S.A.*, 508 F.3d 597, 601 (11th Cir. 2007)).

23-CV-1887 JLS (KSC)

over the same claim"[)] is informed by the idea that "an anti-suit injunction ought not issue *if it would result in depriving the plaintiff of his or her only remedy*."  George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 Colum. J. Transnat'l L. 589, 626 & n.142 (1990) (emphasis added).

This brings the Court back to the more limited understanding of the can/capable inquiry, which the Court will adopt here.  By determining the issues raised in a foreign action *must* be handled in arbitration, a court confirms the plaintiff in the foreign case has *a* forum to pursue her claims.  *See id.*; *see also Applied Med.*, 587 F.3d at 918 (finding district court ruling "dispositive of [foreign] claims" in part as "those claims . . . could have been asserted in the district court, whether or not they have any merit").  By contrast, Petitioners' approach would not have the same protective effect.  Accordingly, the Court respectfully declines to follow *Citigroup*'s lead.

### D.   Discussion

Applying the above understanding of *Gallo* and its progeny, the Court now asks whether all issues raised in the Mexico Proceedings (1) *are* subject to the Parties' Agreement; and (2) *would* be resolved if the domestic action were to be decided in Petitioners' favor.  The answer to both questions is no for the same reason: arbitrability determinations are indispensable to the same-issues/dispositive inquiry's "interrelated" requirements.

Petitioners argue Respondent's "wrongful termination claim in the Mexico Proceedings" falls within the Parties' "broad" Agreement.  Mot. at 13.  And indeed, the Arbitration Agreement purports to cover "[a]ny and all controversies or claims . . . arising out of or relating to employee's employment or its termination at the Company."  Manahan Decl. Ex. 3 at 15.  So, on first blush, Petitioners' argument seems like a slam dunk.

Petitioners fail to recognize, however, that the Ninth Circuit's threshold inquiry also considers enforceability and validity.  Take *Microsoft*, for instance.  There, the court grounded its analysis in part on the "compelling reasons" for effecting "freely negotiated private international agreement[s]" that are "*unaffected by fraud, undue influence, or*

*overweening bargaining power*."   696 F.3d at 884–85 (emphasis added) (quoting *M/S Bremen*, 407 U.S. at 12–13); *see also Applied Med.*, 587 F.3d at 918 (relying in part on lower court's decision—which was not appealed—that the contract was enforceable).  This Court has difficulty imagining similarly compelling reasons for enjoining foreign litigation based on a potentially *unenforceable* agreement.  Put differently, not all disputes covered by an arbitration clause's terms are in fact "subject" to arbitration.[12]

Similarly, given the importance of arbitrability to *Gallo*'s threshold inquiry, the Court cannot conclude that this case can dispose of all issues raised by the wrongful termination claim brought in the Mexico Proceedings.  The instant action has required the Court to make only two findings relevant here: (1) a written agreement to arbitrate existed; and (2) said agreement contained a valid delegation clause.  *See* Order at 5, 9.  No other issues pertaining to the Parties' underlying employment dispute currently await—or are guaranteed to later require—this Court's attention.  And neither ruling confirms that Respondent's wrongful termination claim is in fact arbitrable; the arbitrability question will remain unanswered until the arbitrator acts.  In other words, while ruling on the arbitrability of issues raised in a foreign action may establish that claims raised abroad must be arbitrated, *see Paramedics*, 369 F.3d at 653, concluding the Parties must arbitrate arbitrability yields no such clarity.

Petitioners' reference to *WTA Tour, Inc. v. Super Slam Ltd.*, which dispatches the question at issue here with little discussion, does not alter the Court's conclusions.  *See* 339 F. Supp. 3d 390, 405 (S.D.N.Y. 2018).  After finding an arbitration agreement existed and that questions of arbitrability were reserved for the arbitrator, the *WTA Tour* court acknowledged *Paramedics*' holding: "A ruling that certain claims are arbitrable is dispositive of any foreign suits concerning those claims."  *Id.* at 402, 405 (citing

---

[12] For example, an arbitration agreement can be rendered unenforceable on "such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  So, as with forum selection clauses, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements."  *Martinez-Gonzalez v. Elkhorn Packing Co. LLC*, 25 F.4th 613, 620 (9th Cir. 2022) (quoting *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268 (9th Cir. 2006)).

*Paramedics*, 369 F.3d at 653).  The court then seems to have assumed, without explanation, that *Paramedics* applies equally to rulings on the delegation of arbitrability.  *See id.*  This Court's review of Ninth Circuit precedent indicates, however, that rulings on arbitrability *delegations* and rulings on *arbitrability* are not fungible in the anti-suit injunction context.

By seeking an anti-suit injunction in this posture, Petitioners invite the Court to overlook a catch-22 of their own making.  As Petitioners successfully argued that the Agreement contains an enforceable delegation clause, this Court cannot rule on whether Respondent's claims are subject to arbitration.  Order at 5–10; *see also Caremark, LLC*, 43 F.4th at 1030 ("[I]f the parties did form an agreement . . . containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator . . . .").  Consequently, the Court remains unable to determine whether this action can resolve all the issues in the Mexico Proceedings.  But Petitioners now ask for an anti-suit injunction on the grounds that Respondent's claims *must* be arbitrated and thus *can* be disposed of by this Court.  Petitioners may not have their cake and eat it too.

### E.    Conclusion

Given the above, the Court concludes that, as the arbitrability of the claims raised in the Mexico Proceedings remains unsettled, Petitioners have failed to satisfy the threshold requirements for attaining an anti-suit injunction.  Petitioners' Motion is thus **DENIED**.

The Court nevertheless pauses to acknowledge a policy argument underlying much of Petitioners' briefing.  Petitioners repeatedly complain that refusing to grant an anti-suit injunction based on a delegation clause would, contrary to public policy, dramatically undermine arbitration agreements.  *See generally* Mot.  But there are several reasons, beyond the fact that few cases like this one appear to exist, to discount Petitioners' bluster.

First, Petitioners' appeal to the policy favoring the enforcement of freely made contracts cuts both ways.  *Gallo*'s threshold inquiry applies more cleanly to arbitration agreements that lack delegation clauses.  *See supra* Section I.B.  And while contracting parties *may* delegate arbitrability, they may just as easily decide not to.  Parties are free to

weigh the costs and benefits of both approaches and craft their agreements according to their preferences.  If the availability of a foreign anti-suit injunction is important, the parties can presumably factor that into their decision.  Perhaps parties could even build a delegation clause that provides an exception for courts undertaking the anti-suit injunction analysis.[13]  In any event, the Parties here signed an agreement with a broad delegation provision, and they—along with the Court—must live with that choice.[14]

Second, Petitioners forget that, in the land of contracts, arbitration agreements are not special.  The FAA's policy favoring arbitration "make[s] 'arbitration agreements as enforceable as other contracts, but not more so.'"  *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).  The FAA thus creates "a bar on using custom-made rules" to "tilt the playing field in favor of (or against) arbitration." *Id.* at 419.  The Ninth Circuit has created a test for evaluating the propriety of enforcing a contract by way of an anti-suit injunction, and this Court has endeavored to faithfully employ that test here.  Yes, the Court's approach, if taken elsewhere, could complicate the enforcement of arbitration agreements containing delegation clauses (which, in this Court's experience, are not uncommon).[15]

---

[13] Parties may delegate some gateway questions of arbitrability without delegating others.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("[P]arties may agree to limit the issues subject to arbitration.").  For example, broad delegation clauses do not necessarily delegate the issue of waiver, even though waiver is an arbitrability question. *See Martin v. Yasuda*, 829 F.3d 1118, 1122–24 (9th Cir. 2016).

[14] The Court also notes that, while Respondent previously contended arbitrability was a matter for this Court, *see* Opp'n to Pet. at 11–12, Petitioners argued vehemently and successfully that the Court had to keep its hands off the issue, *see* Reply Supp. Pet. at 3–4; Order at 9.  Presumably, Petitioners could have waived the delegation provision if they wanted to prioritize an anti-suit injunction.  No psychic abilities were needed to foresee the quandary Petitioners' conflicting positions now land them in; Petitioners made their delegation and anti-suit injunction arguments in the *same filing*. *See* Reply Supp. Pet. at 3–4, 10–11.

[15] The Court is not blind to the fact that delegations of arbitrability, though not to be implied blithely from ambiguous terms, are not difficult to insert into an arbitration agreement.  Indeed, this Court has joined several others in concluding that Ninth Circuit case law allows parties—whether sophisticated or not—to clearly and unmistakably delegate arbitrability simply by incorporating the AAA's rules by reference. *See Fischer v. Kelly Servs. Glob.*, LLC, No. 23-CV-1197 JLS (JLB), 2024 WL 382181, at *9–10, *14 n.16 (S.D. Cal. Jan. 31, 2024).

One could even argue *Gallo*'s framework is not a perfect fit for cases such as this one. But this Court cannot ignore Ninth Circuit decisions and craft a new rule simply because this case involves an arbitration agreement. *See id.* at 418 ("[A] court may not devise novel rules to favor arbitration . . . .").

In any event, the Court's approach would likely make little difference in most arbitration-related cases. Arbitration allows parties to pursue the "speedy and efficient" resolution of disputes. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *see also AT&T Mobility LLC*, 563 U.S. at 344 ("The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures . . . ."). Arbitrability is a threshold issue that must typically be decided at the outset of a case. So, parties initiating arbitration proceedings can generally expect to learn whether their claims are arbitrable relatively quickly. Conversely, the lengthy limbo in this action is unique and was avoidable. Had Petitioners not waited years to enforce the delegation clause, the arbitrability of Respondent's claims would almost certainly have been decided long ago.

And even had Petitioners' Motion survived the threshold inquiry, it would still fail upon consideration of *Gallo*'s remaining factors for the reasons explained below.

## II.   Step 2: The *Unterweser* Factors

Petitioners contend all four *Unterweser* factors[16]—any one of which might justify an anti-suit injunction, *Microsoft*, 696 F.3d at 881—apply here. The Court cannot agree.

### A.   *Frustration of Forum Policy*

Petitioners point out that the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Some courts have concluded this policy "applies with particular force in international disputes."

---

[16] For ease of reading, the Court repeats these factors here: "whether the foreign litigation would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations." *Microsoft*, 696 F.3d at 882 (alterations adopted) (quoting *Gallo*, 446 F.3d at 990).

*See Paramedics*, 369 F.3d at 654.  In the analogous context of forum selection clauses, this *Unterweser* factor weighs heavily in the movant's favor if "the forum selection clause [would] effectively become[] a nullity" absent an anti-suit injunction.  *Gallo*, 446 F.3d at 992.  The same is undoubtedly true for arbitration agreements.  *See id.* at 993 (explaining policies favoring both forum-selection and arbitration clauses are motivated by the same considerations); *see also Mastronardi Int'l*, 437 F. Supp. 3d at 782 (citing *Gallo* to support existence of "policy in America of upholding arbitration clauses").

However, the record does not suggest allowing the Mexico Proceedings to continue at this time would frustrate this pro-arbitration policy sufficiently to justify an anti-suit injunction.  Per Petitioners, as "the parties have agreed to arbitrate . . . , the Court must require them to do so to give the parties the benefit of the bargained-for agreement."  Mot. at 15.  This is true, which is why the Court has ordered the Parties to sort out arbitrability in the U.S. Arbitration Proceedings.  *See* Order at 19.  As the Court understands it, those arbitration proceedings have been ongoing for some time.  *See generally* Osuna-Gonzalez Decl.  As the arbitrator has yet to rule on arbitrability—a decision apparently delayed further by Petitioners' own actions, *see id.* ¶¶ 6–9—whether the Parties' Agreement will require more to be done in arbitration is not yet clear.  So, in contrast to *Gallo*, this is not presently a case where "[a]n anti-suit injunction is the only way" to "effectively enforce the [arbitration agreement]."  446 F.3d at 993; *see also LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 200 (2d Cir. 2004) (declining to grant anti-suit injunction against litigant seeking a ruling from a Mexican court as the litigant was also participating in arbitration).

Of course, if the arbitrator eventually finds Respondent's claims are arbitrable, and Respondent refuses to drop his case in Mexico, the Court might reach a different conclusion.  But at present, Petitioners have not shown this factor weighs much in their favor, if at all.[17]

---

[17] Though the *Unterweser* factors are disjunctive, that one factor might apply to some degree does not automatically justify an antisuit injunction.  *See Gallo*, 446 F.3d at 990 ("[I]f any of the four elements is present, an anti-suit injunction *may* be proper." (emphasis added)).

23-CV-1887 JLS (KSC)

### B.     Vexatious or Oppressive

Next, Petitioners unconvincingly argue the Mexico Proceedings are vexatious. "Vexatious" is defined as "without reasonable or probable cause or excuse; harassing; annoying." *Microsoft*, 696 F.3d at 886 (quoting *Black's Law Dictionary* 1701 (9th ed. 2009)).   Here, Respondent began pursuing his claims in Mexico well before Petitioners sought to resolve the dispute in arbitration.   "Thus, this action is not like other cases where the foreign litigation was filed after the original lawsuit was brought in a court in the United States which raises the spectre of forum-shopping and/or vexatious litigation." *Citigroup Inc. v. Villar*, No.   2:19-CV-05310-GW-FFM,   2019 WL 4565175,   at *3   (C.D. Cal. June 19, 2019); *Huawei Techs., Co. v. Samsung Elecs. Co.*, No. 3:16-CV-02787-WHO, 2018 WL 1784065,   at *10–11   (N.D. Cal. Apr. 13, 2018)   (finding foreign action not vexatious where "timing concerns present in *Microsoft* [were] not present").

Moreover, Respondent maintains he initiated the Mexico Proceedings in good faith, and nothing in the record contradicts him.   *See* Opp'n at 11–12.   So, to the extent "any duplication [is] evident in the U.S. action[] and foreign action[]," the Court finds it "is not so 'unreasonable' that it suggests motive to harass or annoy." *Apple Inc. v. Qualcomm Inc.*, No. 3:17-CV-00108-GPC-MDD, 2017 WL 3966944, at *13 (S.D. Cal. Sept. 7, 2017). Similarly, Petitioners cannot rely on cases like *Gallo*, where the foreign litigant's conduct was "potentially fraudulent," as no hint of fraud exists here.   *See* 446 F.3d at 984.

Petitioners' alternative argument, that the Mexico Proceedings are "a delay tactic," Mot. at 15, is so absurd that the Court dignifies it with analysis only reluctantly.   It bears repeating: The Mexico Proceedings—and Petitioners' involvement therein—began *years* before Petitioners sought to compel arbitration (either before this Court or in Mexico).[18]   If the resolution of the Parties' dispute has been delayed, Petitioners have been the cause. The Court is therefore unwilling to label the Mexico Proceedings "vexatious." *See Villar*,

---

[18] At least as of April 16, 2024, Petitioners had never raised the issue of the Arbitration Agreement in the Mexico Proceedings.  *See* Lujan Decl. ¶ 3.

2019 WL 4565175, at *3 (denying injunction where "Plaintiffs ha[d] been aware of Defendant's Mexican lawsuit since 2013 and took no action to stop that proceeding at that time"); *Mastronardi Int'l*, 437 F. Supp. 3d at 782 (concluding foreign case not vexatious in part as "[plaintiff] waited eighteen months to move for the anti-arbitration injunction").

### C.   In Rem *or* Quasi in Rem *Jurisdiction*

Petitioners contend "allowing the Mexico Proceedings to continue would undermine [1] this Court's jurisdiction to compel Sanchez's claims to arbitration for an arbitrator to determine arbitrability, [2] the arbitrator's jurisdiction to determine arbitrability, and [3] the Court's jurisdiction to enforce or vacate the arbitrator's award." Mot. at 16.

Petitioners exclusively cite cases from other circuits, and it shows. In the Ninth Circuit, the question is whether the foreign litigation "threaten[s] the issuing court's *in rem* or *quasi in rem* jurisdiction." *Microsoft*, 696 F.3d at 882 (emphasis added) (quoting *Gallo*, 446 F.3d at 990). Neither type of jurisdiction is at issue here,[19] so this *Unterweser* factor does not apply. *See Po-Hai Tang v. CS Clean Sys. AG*, No. 11-CV-00212 BEN RBB, 2011 WL 4073653, at *2 (S.D. Cal. Sept. 13, 2011) (denying anti-suit injunction in part because "Plaintiff d[id] not allege that *in rem* or *quasi in rem* jurisdiction exist[ed]"); *SynCardia Sys., Inc. v. MEDOS Medizintechnik, A.G.*, No. CIV 06-515-TUC-CKJ, 2008 WL 11339957, at *3 (D. Ariz. Jan. 28, 2008) (similar).

### D.   *Other Equitable Considerations*

Under the last *Unterweser* factor, "[f]oreign litigation may be enjoined when it [1] causes substantial inconvenience, unnecessary expense, and duplication of efforts"; or "[2] threatens inconsistent rulings or a race to judgment." *Mastronardi Int'l*,

---

[19] Whereas *in personam* jurisdiction "is the power of a court to enter judgment against a person," *United States v. Obaid*, 971 F.3d 1095, 1098 (9th Cir. 2020) (quoting *SEC v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007)), "*in rem* jurisdiction is the court's power to adjudicate rights over property," *id.* Meanwhile, a *quasi in rem* action is one that "involves the assertion of a personal claim against the defendant of the type usually advanced in an *in personam* action," but with the added layer of "the attachment or garnishment of some or all of the property the defendant may have in the jurisdiction." *Id.* at 1098–99 (quoting *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852, 860 n.4 (9th Cir. 2005)).

437 F. Supp. 3d at 783 (citing *Seattle Totems*, 652 F.2d at 855–56).  Neither applies here.

To the extent the Mexico Proceedings have inconvenienced Petitioners or increased expenses unnecessarily, the damage is done.  In no small part due to Petitioners' lackadaisical pursuit of arbitration, the Mexico Proceedings are in their final stages.  And even if Petitioners might be further inconvenienced by the Mexico Proceedings, Petitioners have not explained why such hypothetical inconvenience is "so extraordinary or substantial that [it] justif[ies] equitable injunctive relief."  *Apple Inc.*, 2017 WL 3966944, at *14.

Relatedly, Petitioners are, by their own hands, already losing any "race to judgment" threatened here.  Petitioners allowed the Mexico Proceedings to plod along for years before lacing up their running shoes.  Petitioners cannot cry foul now because the Mexico Proceedings have edged closer to the finish line.  For similar reasons, the risk of inconsistent rulings could not support Petitioners' Motion on its own, particularly as Petitioners dedicate only one sentence to the issue and no other *Unterweser* factors apply.

## III.   Step 3: Impact on Comity

In *Gallo*'s final step, courts evaluate whether an anti-suit injunction's "impact on comity [would be] tolerable."  446 F.3d at 991.  Had Petitioners not already faltered at steps one and two of the anti-suit injunction test, their luck would have run out here.

One could forgive Petitioners for thinking they had a strong comity hand to play. Comity "is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.'"  *Id.* at 994 (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)). Typically, "where two parties have made a prior contractual commitment to litigate disputes in a particular forum, upholding that commitment by enjoining litigation in some other forum is unlikely to implicate comity concerns."  *Microsoft*, 696 F.3d at 887.  In fact, allowing a party "to evade the enforcement of an otherwise-valid" contract by "rush[ing] to another forum" could *negatively* affect international comity.  *Gallo*, 446 F.3d at 994.

/ / /

Nevertheless, questions of comity demand a fact-intensive and case-specific inquiry. *See Microsoft*, 696 F.3d at 887 ("[C]ourts must in their discretion evaluate whether and to what extent international comity would be impinged upon by an anti-suit injunction under the particular circumstances."). Here, the facts are unique. While *Gallo* contemplated an "otherwise-valid forum selection clause," the validity and enforceability of the Parties' Arbitration Agreement as applied to Respondent's claims is up in the air. And over the last few years, the Mexico Proceedings have neared their end. Halting the Mexico Proceedings *after* the Labor Board has expended its resources and almost reached a resolution, but *before* the arbitrability of Respondent's claims has even been confirmed, would have a distinctive and—in this Court's view—intolerable impact on comity.

## IV.   Next Steps

As the Court herein denies Petitioners' Motion, the only questions remaining are whether the denial is with or without prejudice and, if without prejudice, what the next steps in this action should consist of.[20]

As to the first issue, it is notable that the key element in the Court's analysis—that the arbitrability of Respondent's claims remains an open question—is subject to change at any time. If the arbitrator were to deem Respondent's claims arbitrable, and Petitioners again sought an anti-suit injunction, the Court might reach a different conclusion than the one it arrives at today. As the Court's reasoning hinges on an undefined variable, rather than on a decision set in stone, the Court is inclined to deny the Motion without prejudice.

---

[20] Petitioners also seek the alternative remedy of a temporary injunction "enjoining the Mexico Proceedings while the Arbitrator determines the enforceability of the Arbitration Agreement." Mot. at 19. Petitioners contend such an injunction is warranted because they would "suffer irreparable harm" should they be "forced to litigate [Respondent's] claims" and thereby "los[e] the 'very benefit of the arbitration clause' that the [P]arties bargained for." *Id.* (quoting *WTA Tour*, 339 F. Supp. 3d at 406). The same argument was not persuasive when made regarding the *Unterweser* factors, *see supra* Section II, and it is no more compelling here. Moreover, Petitioners do not cite Ninth Circuit authority supporting the availability of their requested temporary injunction, explain whether Respondent could stay his claims in Mexico without dismissing them pending an arbitrability decision, nor identify what framework the Court would use to evaluate such an injunction if not *Gallo*'s (which Petitioners have already failed). Therefore, the Court will not grant Petitioners' alternative request.

Not surprisingly, Respondent seeks a different outcome.  Unlike arbitrability's unanswered status, the fact that Petitioners waited years to pursue an injunction will not change with time.  Respondent argues this delay is an insurmountable obstacle that would prevent Petitioners from securing an anti-suit injunction even if his claims were ultimately found to be arbitrable.  *See* Opp'n at 14–15.  Respondent thus asks the Court to deny the Motion with prejudice.

Though not without some merit, the Court rejects Respondent's position.  An unexplained delay in seeking injunctive relief "undercut[s] [a litigant's] claim of irreparable harm" and thus weighs against the issuance of an injunction.  *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015).  "Usually," however, "delay is but a single factor to consider in evaluating irreparable injury," and "courts are 'loath to withhold relief *solely* on that ground.'"  *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (emphasis added) (quoting *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)).  As other aspects of the irreparable harm calculus could be impacted by a decision from the arbitrator on arbitrability, the Court is reluctant to hold that Petitioners are permanently ineligible for injunctive relief at this stage.[21]

Moving on to matters of case management, the Court notes that Petitioners initiated this action seeking to compel Respondent's participation in arbitration and to secure an anti-suit injunction.  With the former matter decided and the latter disposed of for the time being, there are no pending matters for the Court to resolve in this dispute.[22]  Still, as the

---

[21] The Court does not mean to suggest a future anti-suit injunction motion will necessarily succeed so long as it is filed after the arbitrator has decided Respondent's claims are arbitrable.  The Court expresses no opinion on the viability of such a motion.  Here, the Court declines only to take the possibility of an anti-suit injunction off the table entirely given the outstanding questions in—and somewhat unique posture of—this case.  And though it would seem that bouncing between the arbitrator and federal court might take away from the efficiency so often touted as a benefit of arbitration, the Court also expresses no opinion on whether the Parties should or could address future requests for injunctive relief to the arbitrator.

[22] That said, the Court could be called on in the future to, for example, "enforce[] subpoenas issued by the arbitrator[]" or "facilitate[] recovery on an arbitral award."  *Smith v. Spizzirri*, 144 S. Ct. 1173, 1178 (2024).  So, had the Parties asked the Court to stay this action pending the completion of arbitration, the

23-CV-1887 JLS (KSC)

Court today leaves the door open to an anti-suit injunction, an entry of final judgment, absent additional input from the Parties, would not be appropriate. *Cf. Bank of Am., N.A. v. Micheletti Fam. P'ship*, No. 08-02902 JSW, 2008 WL 4571245, at *7 (N.D. Cal. Oct. 14, 2008) (entering judgment where "there [was] no federal action pending involving the disputes at issue" and plaintiff "ha[d] obtained all relief it sought" from the court). The Court will thus give the Parties the chance to weigh in before taking additional action.

## CONCLUSION

In light of the foregoing, the Court **DENIES** Petitioners' Motion (ECF No. 16) **WITHOUT PREJUDICE** to Petitioners' filing a renewed motion seeking an anti-suit injunction after the arbitrator has ruled on the arbitrability of Respondent's claims. <u>Within twenty-one (21) days</u> of the date of this Order, the Parties **MAY FILE** a motion, either jointly or individually, asking the Court to stay this case, close the case and enter judgment, or take any other procedural action that may be appropriate. Should no Parties file such a motion, the Court will enter an order administratively closing this case. If administratively closed, the Parties will remain able to move to reopen this matter when appropriate, such as for judicial consideration of an anti-suit injunction in accordance with this Order.

**IT IS SO ORDERED.**

Dated: June 6, 2024

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

---

Court would likely have been required to do so. *See id.* Neither side, however, requested a stay or otherwise voiced an opinion on the future of this case beyond the possibility of an anti-suit injunction.